Next case will be 091011. Next case will be 091011, Henry James A Ross. Good morning, Your Honours. May it please the court. I'm Phil Pippinger of Leidy Voight & Mair, here on behalf of the appellants, James Ross and William Lynch, also the inventors here. This matter comes before you on appeal from a decision of the United States Patent Office Board of Appeals, affirming the examiner's rejections of all the claims at issue. The briefing is fairly extensive on what the claims are and what the issues are, but before I get into it, I just wanted to briefly point out there are two claims primarily at issue. Claim 7, which is a method claim, and Claim 37, which is a system claim. They're very similar. We're going to focus primarily on Claim 7. There's a number of steps here. The primary function of the method is to process a starting pool of data, active patient records, and in that processing, in keeping with the designation, to produce an output, which is here referred to as a grease board, and the function of the invention is that it's able to produce one of a variety of grease boards, depending upon that designation and the starting information. Claim 37 is similar. It's a system claim, security module, tracking module, and they recite the functionalities that relate to the same aspects. There are two primary issues here having to do with the rejection of these claims under Section 102, based on a reference by Mr. Cullen, and we'll call it the Cullen reference here, and it's been referred to in the briefing that way. The first issue that's raised is simply does the PTO have the discretion to go outside of the reference and to create an interpretation of the reference in keeping with its reading of the claim, or is it stuck with the references? Must it take them as they come? We would submit, and I think it's clearly the case, that the Patent Office has to take the prior art as the prior art appears. It cannot change the prior art and can certainly not misinterpret the prior art or reach an interpretation that's inconsistent with the prior art. In this case, specifically, the issue has to do with the variety of grease board views cited in Claim 7, or encompassed in Claim 7. The Patent Office has indicated that, at least at this stage of the proceedings after the board proceedings, on this briefing has indicated that it feels that the Cullen reference teaches two grease board views, one of which is the local census, which does have to do with patients and does list patients. The other view that is pointed to by the Solicitor's Office is a general index view. When you read Cullen, and we've read it pretty intensively with the inventors and ourselves, that general index view is a listing of terminals in a hospital. It's not patients or terminal patients or anything to do with patients. It's terminals. West Terminal, East Terminal, Terminal 1, Terminal 2. It doesn't list patients and it's not, as the claim would require, derived from a process. I don't understand how you can say they couldn't find the listed patients because what it says is if you've got the patient name wrong, go to the general index. There must be something in the general index that lists patients. If you read the briefing that they put together carefully on that, they make a point to say you can go back to the general index and immediately select a patient. That's not actually what Cullen says. Cullen says what you just said. You can, if you selected the wrong patient, go back to either the local census and pick your patient or go back to the general index view. Because from the general index view, which is a listing of terminals, say you were in the wrong... How would it help you to find the name of the patient if all the general index does is list terminals? The presumption there, it could be, if you read Cullen carefully, it could be that you just picked the wrong patient. You were looking for John Smith and you picked Bob Smith, so go back to the local view and pick John. It could be that you're in the wrong terminal, so you go back to the general index view and pick the East Terminal because you were in the wrong one. Then within there, you go through the hierarchy to get to the patient that you want. It's not that you can't get to the patient you want through any view. It's just what the view is. Is the view a product of parsing through active patient record data in keeping with the user designation to present this view? Certainly a listing of terminals, there may not even be any patients at some of those terminals. It doesn't have anything to do with the patients. It's just a listing of machines. If you read Cullen, it talks about terminals and what they are and their terminal programming and input. They're just machines. So whether I'm at the hospital or not doesn't change that terminal view. It's simply not a greaseboard view in the sense, you can call it a greaseboard view or a widget view or whatever kind of view you want, but the claim defines a greaseboard view as the end product of the system parsing through these active patient records to produce this view that includes a subset of them. The terminal view certainly doesn't include any of that patient data, any subset of patient data, and it's not derived from patient data. It's derived from knowledge of what terminals the hospital has. Our standard review for cases generated by the PTO is essentially substantial evidence. Where is there a lack of substantial evidence to support their decision? I would say you don't need to look any further than Cullen itself. The places they cite in Cullen that are factually correct simply state there's a view of terminals. There's a terminal view. But they did disclose a variety of greaseboard views, right? No. When we talk about greaseboard views, we're talking about greaseboard views within the claim, and the general index is not a greaseboard view within the claim because it's not derived from that pool of active patient records. It's just derived from whoever built the hospital and named the terminals. So it's not a greaseboard in the sense of the claim. The only way you get to that is sort of the backup point. The next point was if you ignore certain limitations in the claim, then you can refer to a greaseboard much more broadly as being anything. And then, granted, if you're ignoring limitations in the claim, then that's a greaseboard, and a recipe for butterscotch pancakes is a greaseboard. I mean, anything is a greaseboard view then. But any information which is part of the database could be part of the greaseboard. No, because if you look at the claim, it's an active patient list greaseboard. It gives you a set of active patient records for information that has to be selected from in accordance with this user designation. It has to show patient data. It has to show or be derived from patient data. But within the database itself. That data is in the database itself. So there's other information in the database. There's information, you know, who they buy their penicillin from, things like that. But if they have a display of suppliers, that's not a greaseboard that would meet the limitations of this claim. It begs the second issue. Does it have to meet the limitations of the claim, or can we ignore some of these limitations? But if we're at the stage where we're crediting the limitations, then that's certainly not a greaseboard view. Then my second point goes to what we just talked about. Can you ignore certain limitations here? And this was really the primary thrust in front of the board, the patent board, and it's certainly at least a secondary thrust in the solicitor's briefing, which is that data is nonfunctional and displays are nonfunctional, and therefore we can ignore those limitations. And there's certainly no assertion by me or by the inventors that data itself is functional. You know, I see data here in terms of names. You know, it has no function. It's a letter. You have to do something with it, like read it or give it to somebody to give it a function. And so here, you know, the data, a room location, a patient name, these things are not on their own functional, and the display that comes out the other side of this system is not by itself functional either, unless you do something with it. But the claimed invention is not data and is not a display. The claimed invention is a method of processing this pool of data in a particular way, such that a result of that inventive process is a particular display. So this is very different than the cases where you could quite clearly ignore the data, like a name on a spoon or, you know, words in a user manual. You know, whoever's name is on that spoon doesn't change how I use the spoon. And whatever it says in the user manual, the device stays exactly the same and operates exactly the same. Here, if you don't have the right data to start with, the invention is meaningless. You don't, you know, there's no chance to do what the invention says you're supposed to do, which is to present this display from a subset of this data in keeping with the designation. So it seems here, in contrast to some of these cases cited by the solicitor, the data is very clearly functionally related to the invention and cannot simply be ignored. Thank you. Mr. Gandola. Good morning, Your Honors. May it please the Court. Ross claims here to use his own repeated characterization of his invention, a computerized hospital dry erase board like you would see on the television show ER. The board correctly found that substantial evidence shows that that claimed invention is anticipated by the 25-year-old call-in reference. Well, why did the board not address this in terms of obviousness? You know, why try to squeeze this into this earlier reference, which raises questions instead of address it on an obviousness issue? That's a question that I can't answer. I know that anticipation is the epitome of obviousness, so perhaps that's why they chose to go the anticipation route. But the board found that the variety of... They could do an alternative. They have two grounds, right? Absolutely they could have, yes. They chose to limit it to one ground, though, anticipation. And they found that the multiple grease board view limitation was taught in Collins. There's no dispute here that the local census qualifies as a grease board view. The dispute is whether the general index is a grease board view. And if we look at the language of Collins, page A353 of the record, it's the second sentence of the second paragraph on that page, which we've already discussed. It explains that if a user is trying to select a patient from the call-in nursing station system, but he selects the wrong patient, he can use the control functions to go back to the local census or to the general index to select the correct patient. Now, the board found at page A8, finding of fact number 7, that that disclosure establishes that the general index is a list of patients in the entire hospital. Ross is focusing on the last phrase of the sentence, to all terminal locations in the hospital, and wants to read that to mean that the general index is a list of computer terminals. That reading makes no sense in the context of this sentence. If it's a list of computers, it would be impossible to select the correct patient. Ross has never even explained how, if it's a list of computer terminals, you could make a correct patient selection from the terminal list. So that is why substantial evidence supports the board's finding that the general index is a list of patients. It, therefore, qualifies as a greaseboard view, satisfying the variety of greaseboard view limitation. Now, the board, looking at the background of this case, the board even asked counsel for Ross three times at the hearing before the board, on pages A240 and 241 of the record, why the general index was not a list of patients. And the only answer that counsel for Ross ultimately came up with at page A241 is that he, quote, couldn't tell you exactly. Now, we also have, in the background of this case, the board's initial decision, they had raised new grounds of rejection. So they gave applicant Ross the chance to either resume prosecution before the examiner or to pursue a hearing. Now, Ross chose the latter. But if Ross really wanted to answer the question, he could have returned to prosecution before the examiner and proffered a declaration or some other form of evidence to explain why the general index was not a list of patients. Ross never did that. So, for these reasons, even if you would accept Ross's view that the general index is a list of computers, the standard of review of substantial evidence still means that you would affirm the board. Because this court has said multiple times that when there are two inconsistent but reasonable readings of the references and the office selects one over the other, that is the epitome of a decision that must be supported for substantial evidence. Isn't the appendix A353 that shows a choline reference showing essentially more than one index, multiple indexes? Yes, Your Honor, it does. The board selected to discuss and base its findings on two of the indexes, the local census and the general index. The reference also talks about a census index. The board made no findings about what the census index would include and Collins doesn't actually discuss census index, so we don't know. It potentially could be another Greece Board view, but we need not go there because we know, based upon the second sentence on A353, that we have... So, as long as there's more than one and it covers the limitation and the claim. Yes, Your Honor. Now, the next issue I would turn to is the discussion about the limitations that have been ignored. This non-functional descriptive matter. If we look at the language of the claim on page A3-4 of the record, there what we have... I want to be clear so we all understand what language we're talking about. We're talking about patient-specific information that would be called up or accessed through a Greece Board. It would include the patient's name, their position, their room location, x-ray data, data along those lines. The board found that that portion of the claim is what constituted non-functional descriptive matter that was not entitled to any patentable weight. It made that finding at pages A6-7, finding of fact number 4, which it elaborated on on pages A13 of the original decision and 23 of the rehearing decision. That data is considered to be non-functional because it doesn't drive either of the method steps. It doesn't affect the log-on step and it doesn't affect the displaying step. What it is is the result of a user executing the method. That would be the data that would be pulled up onto the screen. The last issue I'd like to mention is counsel for us is raising claim 37. It is the government's position that counsel for us is improperly doing that today because he never separately argued claim 37 before the board. At pages A180 of the record, he explained that the basis for his traversal for claim 37 and his words are substantially the same as those provided for claim 7. On that representation, the board actually at page A3 made a finding that Ross failed to challenge claim 37 with any, quote, reasonable specificity. So this court need not even look to claim 37. But if it would choose to do so, the basis for the rejection by the office collapsed essentially into the same basis for claim 7. It has to do with whether the variety of Greece Board views limitation is satisfied. And for the reasons that we discussed earlier, based upon finding of fact 7 at page A8 and the ensuing discussion at A14 and A24, it is. So for these reasons, if the court has no further questions, the director would ask that this court affirm the board's anticipation rejection of the computerized hospital dry erase boards. All right, thank you. Thank you. I'll just take a second. With respect to the first issue as to whether the general index view is a listing of patients, it's worth noting that in the solicitor's brief in this matter, there were a number of misquotations and miscites all aimed at trying to create the impression that there's multiple listings, when in fact one of the quotations, for example, when you complete it, talks about multiple listings for drug names. So there's really nothing in Colin that's even remotely relied on. I'm putting aside those things. I'll say that should be considered. I'm not going to consider the misquotations. The only thing that can really be relied on by the patent office is this one statement on page A353 and this statement is being given as substantial evidence by the patent office that the terminal index is a listing of patients and yet the plain English language of this statement says the general index to all terminal locations in the hospital. It's not a listing of patients. It's an index to terminal locations. If I say an index to books, then I'm talking about how do I find a book. If I say an index to patients, then I'd be talking about how to find a patient. An index to a terminal location is not an index to a patient. It's an index to a terminal location. It's just the plain English of the reference. Not only is there not substantial evidence to rewrite this, there's no evidence that this statement, that this general terminal view, has anything to do with patients. Moreover, Colin, if you read the entirety of Colin, describes a hierarchical system with multi-level branched files and needs at page A51, the need to reduce redundancy. This is nothing more than the file system you see on your computer. There's a folder and then within the folder there are files and then within a file there are words. It's a hierarchy. If I see patients at one level, I don't see patients at the next level. I see terminals. In the same way that if I see files at one level, I see folders at the next level, I see computers at the next level. So this is a hierarchical reference within which this reinterpretation of it would make no sense. I'll leave that alone. Moving on to the issue of whether the data pool described in the claim is functional or non-functional, it almost goes without saying, when you read the claim, as the solicitor did, the data is processed in a specific way to yield a specific result. The data couldn't be any more functional. The data is critical. Without the data, there's no result. There's no processing. I don't see how this could be at all like a word on a spoon that has no relation to the function of the spoon. The spoon still works. Here, everything breaks down. The structure of 37, if you want to consider it, waiver or not, doesn't work without the data. The method of Claim 7 doesn't work without the data. There's no result. There's no processing. It couldn't be any more critical. I'm going to rest on that unless there are questions. All right. Thank you. Thank you. Thank you, Mr. Submittee.